# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALAINA RACHELE BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01231-TWP-TAB |
| | ) | |
| KCI TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the Motion for Summary Judgment (Filing No. 30) filed by Defendant, KCI Technologies, Inc. ("KCI"). The Plaintiff, Alaina Rachele Baker ("Ms. Baker"), filed a Complaint alleging that KCI terminated her employment in retaliation for protected activity under Title VII of the Civil Rights Act of 1964 ("Title VII"), including her complaint of gender discrimination to the Indiana Civil Rights Commission. (Filing No. 1.) On August 28, 2015, KCI filed a motion for summary judgment. In her response brief, Ms. Baker indicated that she is no longer pursuing her gender discrimination claim. (*See* Filing No. 42 at 5 n.1.) Accordingly, the gender discrimination claim is dismissed without prejudice, and the Court solely evaluates her remaining retaliation claim.[1] For the reasons stated below, the Motion for Summary Judgment is **DENIED**.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1] Despite the fact that Ms. Baker has decided not to pursue her claim for discrimination under Title VII, her retaliation claim may still proceed independently. *See*, e.g., *Mattson v. Caterpillar, Inc*., 359 F.3d 885, 892 (7th Cir. 2004) (holding that protection under the anti-retaliation provision of Title VII is not "lost simply because an employee is mistaken about the merits of her charge").

judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court reviews the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (noting that, when the non-movant has the burden of proof on a substantive issue, specific forms of evidence are not required to negate a non-movant's claims in the movant's summary judgment motion, and that a court may, instead, grant such a motion, "so long as whatever is before the district court demonstrates that the standard . . . is satisfied.").  *See also* Fed. R. Civ. P. 56(c)(1)(A) (noting additional forms of evidence used in support or defense of a summary judgment motion, including: "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

Thereafter, a non-moving party, who bears the burden of proof on a substantive issue, may not rest on its pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Celotex Corp.*, 477 U.S. at 323-24; Fed. R. Civ. P. 56(c)(1). Neither the mere existence of some alleged factual dispute between the parties nor the existence of some "metaphysical doubt" as to the material facts is sufficient to defeat a motion for summary judgment.  *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997); *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Similarly, a court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

## II. <u>BACKGROUND</u>

The following statement of facts are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Ms. Baker as the non-moving party. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### A. <u>KCI hires Alaina Baker</u>

KCI is a civil engineering and consulting company, headquartered in Sparks, Maryland. On February 29, 2008, Ms. Baker was hired as an Environmental Scientist III and assigned to KCI's Brentwood, Tennessee office. She was given a starting salary of $74,880.00, which was higher than the starting salaries of several male employees who had been hired in the preceding four years. Throughout her employment at KCI, Ms. Baker worked under the supervision of Gary

Mryncza ("Mr. Mryncza"), the Division Chief of Environmental Planning for the Southeast Region of KCI.  In 2010, Ms. Baker was transferred to Indianapolis, Indiana to work as the primary representative to the Indiana Department of Transportation ("INDOT"), a customer of KCI.

**B.      Adam Spiller Promoted as Alaina Baker's Direct Supervisor**

Sometime between the end of 2011 and early 2012, Mr. Mryncza designated Adam Spiller ("Mr. Spiller") as the Interim Practice Leader for SE Natural Resources Group, making Mr. Spiller Ms. Baker's direct supervisor.  The position was not posted for internal applications, in conflict with KCI's stated Equal Opportunity Policy.  In this regard, Ms. Baker notes that job openings at KCI were rarely posted internally and promotions at KCI were, instead, "handed out at the end of the year with raises" or given out as "spot promotions."

In his deposition, Mr. Mryncza testified that he chose Mr. Spiller for the position because of Mr. Spiller's "largest diversity of experience . . . in all of [KCI's] core services".  In addition, he thought that Mr. Spiller's education, professional training, work experience and supervisory experience made him more qualified than Ms. Baker.  When Mr. Spiller was promoted, he had been with KCI for eight years, had nine years of industry experience and also had a master's degree in environmental management from Duke University.  Mr. Spiller had completed both the KCI Emerging Leaders Program and the KCI Professional Leaders Program and had supervised professional employees in KCI's Raleigh, North Carolina office.  In contrast, at the same time, Ms. Baker had been with KCI for five years and had eighteen years of industry experience.  However, she did not have a master's degree.

**C.      Alaina Baker's Presentation at KCI's Northeast Regional Forum**

In February 2013, Mr. Mryncza invited Ms. Baker to make a presentation to senior management at KCI's Northeast Regional Forum.  Ms. Baker had previously voiced concerns to

Mr. Mryncza about the way the different offices were interacting with one another and the lack of resources at the Indianapolis office, and Mr. Mryncza recommended that Ms. Baker present her concerns to the board and upper management.  Mr. Mryncza described it as an opportunity for the outer offices to talk with corporate management about what was and what was not working.  Mr. Mryncza also invited Ms. Baker to present on the perception problems between the owner and corporate office and an overly competitive atmosphere that she perceived as detrimental to the long-term health of the company.

On February 25, 2013, Ms. Baker gave a PowerPoint presentation at the KCI management forum which included an overview of the Indianapolis office, describing the particular challenges facing the office and drawing comparisons between the workload and resources of the Indianapolis office with other KCI offices.  During her presentation, Ms. Baker portrayed KCI's headquarters as having an "image problem with the outer offices".  To demonstrate this point, she contrasted a picture of people doing the "Harlem Shake"[2] in the hallways of the KCI corporate office with a picture of a man covered in burrs after a day of work at a KCI field office.  Ms. Baker's intention was to compare what she described as a culture of sacrifice and isolation faced by KCI employees working in field offices with her perception of what life was like at KCI's headquarters.  During her presentation, she also talked about "power voids and poorly defined roles and responsibilities" at KCI and at one point compared the culture at KCI to Afghanistan "turf wars, constant power struggles, [and] chaos."

Mr. Mryncza considered the presentation to be inappropriate and unprofessional and he alleges that the presentation was not well received by KCI managers.  However, immediately following her presentation, Ms. Baker spoke to both KCI's President, Nate Bell, and CEO, Terry

---

[2] The Harlem Shake was a popular improvisational dance craze on the internet during 2013.  *See* The Harlem Shake [Best Ones]thttps://www.youtube.com/watch?v=8f7wj_RcqYk

Neimeyer, neither of whom expressed concerns regarding the presentation.   Instead, KCI's President told Ms. Baker, "unfortunately, this is nothing we haven't heard before."  Further, KCI's CEO talked to Ms. Baker about the wisdom of investing in Indiana and about the Indianapolis office's need for a copier.

**D.**      **Alaina Baker's Annual Review and Compensation Concerns**

The day after her presentation, Ms. Baker met with Mr. Mryncza and Mr. Spiller for her annual review.  In the review, Mr. Mryncza and Mr. Spiller determined Ms. Baker's performance to be "satisfactory" or better in all of the competencies assessed.  In addition, in ten of the thirteen competencies, she received ratings of "above average" or better.  In particular, Mr. Mryncza and Mr. Spiller rated Ms. Baker "satisfactory" for interpersonal relationships and "above average" for leadership, marketing/business development, and client and customer satisfaction.  Mr. Mryncza and Mr. Spiller also made several positive "manager's comments" on the review including the opinion that, "[Ms. Baker] continues to make our primary client INDOT happy. . . . She has been very successful on this front."

During the annual review meeting, Ms. Baker also raised salary and grade level position concerns for the first time.  She expressed frustration that she had not been offered an opportunity to compete for the promotion granted to Mr. Spiller, that she had not been included in the Emerging Leaders Program, and that she had not been recognized for her efforts in the form of promotions, raises, and bonuses.

On April 5, 2013, Ms. Baker sent a follow-up email to Mr. Mryncza further expressing dissatisfaction with her compensation at KCI and comparing her history of wage increases to those of other employees, both male and female.  (Filing No. 33 at 109-10.)  In support, Ms. Baker identified ten male employees in her group who had received larger salary increases than her.  *Id.*

Ms. Baker asked for further explanation for the discrepancy and requested an immediate promotion and pay raise and expressed her belief that she was not being paid her worth because of her gender. *Id.* In reaction, Mr. Mryncza immediately forwarded Ms. Baker's email to KCI's Vice President of Human Resources, Tammy Jones ("Ms. Jones"). (Filing No. 31-5 at 2). In his email to Ms. Jones, Mr. Mryncza stated the following,

> [Ms. Baker's] email is just documenting the same discussion that we have had twice, once during her [annual review]. . . . There's no doubt that I disappointed her but I am comfortable with the fact that I am compassionate and fair in my dealings with all of my folks. I really do not want her around past Monday but [Mr. Spiller] has asked that I give him a chance to talk to Brad, Bob, and Matt before I insist that she goes so I will sleep on it this weekend.

(*See* Exhibit D to Filing No. 31). Five days later, on April 10, 2013, Mr. Mryncza responded to Ms. Baker's email and explained that she had already received a 2% merit increase in December 2012. Mr. Mryncza told Ms. Baker that no further increase would be forthcoming and accused her of acting unprofessionally regarding her complaints and requests. (Filing No. 33 at 112-13.)

On April 11, 2013, Ms. Baker replied to Mr. Mryncza's email. In her reply, she complained of unequal treatment in compensation, noting that most of her peers received raises beyond a 2% cost of living increase. (Filing No. 33 at 111-112.) Ms. Baker also discussed being designated an ES-III for five years without a promotion or recognition within the company, noting that her responsibilities had dramatically increased during that time. *Id.* At one point, she compared Mr. Mryncza's management style to that of former Vice President Richard Nixon and wrote that Mr. Mryncza was acting equally unprofessionally in regards to her concerns and requests. *Id.* She also added, "it doesn't matter how hard I work or how well I perform, there is an obstacle that I can't overcome, and I have no power to change, that is limiting my career here." *Id.* In response, Mr. Mryncza sent another email to Ms. Jones, stating: "I think it might be appropriate for you to

step in as far as further communications if the response to [Ms. Baker] is anything other than today is your last day, pack up your stuff, and good luck." (Filing No. 33 at 111.)

Following this email exchange, KCI promoted Ms. Baker to an ES-IV position; but did not give her any additional pay raise[3] because Ms. Baker's supervisor, Mr. Spiller, was also an ES-IV and he was still making less than Ms. Baker. (Filing No. 31-3 at 4; Filing No. 33 at 65.)

**E.      Alaina Baker's Discrimination Complaint and Subsequent Termination**

On April 12, 2013, the same day that she received Mr. Mryncza's reply email denying her promotion and raise requests, Ms. Baker filed a discrimination complaint with the Indiana Civil Rights Commission. (Filing No. 33 at 116-17.) Less than a week later, KCI received Ms. Baker's discrimination complaint.

Following receipt of the discrimination complaint, KCI tasked Ms. Jones with the job of investigating Ms. Baker's claims and meeting with Ms. Baker to determine whether her concerns could be resolved "in a manner that would allow her to be an effective manager for KCI." (Filing No. 31 at 12.) KCI senior management decided that Ms. Baker "should personally meet with Ms. Baker to discuss her allegations against her supervisor, Gary Mryncza". (Filing No. 31-3 at 2.) KCI explains that "[t]he goal was to gauge the level of Ms. Baker's antagonism toward her supervisor and her willingness to continue her career at KCI as a productive representative of KCI's interest in Indiana." (Filing No. 31 at 20.)

On May 13, 2013, Ms. Jones met with Ms. Baker at the Indianapolis airport. At the meeting, Ms. Jones discussed Ms. Baker's wage disparity and gender discrimination claims with

---

[3] Pursuant to this litigation, Ms. Baker has subsequently identified seven male employees that received raises in greater percentages and amounts than her as well as four male employees who earned more than her despite having comparable experience. (Filing No. 33 at 124-25.) However, KCI asserts that these men had more experience and more status and responsibility at KCI than Ms. Baker did. (Filing No. 31-3 at 3-4, 7.)

and noted deficiencies in the data Ms. Baker used to compile the pay increase chart that she had emailed to Mr. Mryncza.  In addition, Ms. Jones "tried to determine from Ms. Baker whether she would be happy working for KCI and Mr. Mryncza specifically."  ([Filing No. 31 at 20-21](#).)  Ms. Baker told Ms. Jones that she did not feel supported by Mr. Mryncza, who Ms. Baker thought "controlled [her] destiny"; and that she did not want to stay with KCI "if nothing [was] going to change".  ([Filing No. 32 at 10-11](#), 16.)

On May 30, 2013, Ms. Jones met with Ms. Baker at the Indianapolis airport a second time.  At this meeting, Ms. Jones offered Ms. Baker a mentor, with the stated intention of providing Ms. Baker with guidance and support at the highest level of management in KCI.  Although Ms. Baker thought a mentor was a good idea, she ultimately rejected the idea because she did not think a mentor would help, stating, "[w]hether there's a mentor assigned or not, Gary is going to continue to act like I don't exist and the Indianapolis office is going to continue to suffer."  ([Filing No. 32 at 19](#).)  She added, "[e]ven if we went that route, I'm still the person that filed a complaint.  And my relationship with Gary is irrevocably damaged and not on my part."  ([Filing No. 32 at 55](#).)  Nevertheless, Ms. Baker left open the possibility of having a mentor if the mentor's involvement would improve gender equality and would offer solutions to her complaints.  ([Filing No. 43-3 at 5](#).)  As an alternative option, Ms. Jones offered Ms. Baker a severance pay agreement, which Ms. Baker also rejected.

During the conversation, Ms. Baker told Ms. Jones that she did not feel the need to go above and beyond for KCI anymore.  ([Filing No. 32 at 24](#).)  However, she also stated that she "[did not] want to be a mediocre employee", explaining, "I don't want to be the person that just shows up for work.  I've never been that person.  And I don't plan to start now."  ([Filing No. 43-3 at 3](#).)  Ms. Baker told Ms. Jones that, "in the absence of anything changing", she was not interested in

staying with KCI anymore; that she did not want to work for Mr. Mryncza anymore; and that she did not see staying with KCI as her best choice.  (Filing No. 32 at 19-20; Filing No. 33 at 80.)  Ms. Baker also told Ms. Jones, "the petty part of me is like I want them all to go under."  (Filing No. 33 at 83.)

Following the May 30, 2013 meeting, Ms. Jones spoke with Mr. Mryncza and other KCI executives.  KCI's management was concerned that, if Ms. Baker continued her employment with them, her attitude about the company would ultimately damage its relationships with its clients.  (Filing No. 31-3 at 6-7.)  This was despite the fact that Ms. Baker had no record of company discipline or job performance issues and despite the fact that Mr. Mryncza had never received any complaints or concerns from clients about Ms. Baker's job performance.  (Filing No. 43-1 at 7.)

On July 16, 2013, Ms. Jones and Mr. Mryncza met with Ms. Baker and offered her another severance package.  When she rejected the second severance package, Ms. Jones and Mr. Mryncza terminated Ms. Baker's employment at KCI.

## III.  DISCUSSION

Ms. Baker contends that her termination was in retaliation for filing a gender discrimination complaint with the Indiana Civil Rights Commission.  Title VII prohibits an employer from acting in retaliation against employees who oppose any practice made unlawful under Title VII.  42 U.S.C. § 2000e-3(a) (2012).  Stated differently, "[a]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII."  *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005).  As with a plaintiff's discrimination claims, a plaintiff may proceed under either a direct or indirect method of proof to establish his retaliation claim.  *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d

640, 644 (7th Cir. 2002); *Miller v. Ind. Univ. Health, Inc.*, No. 1:12-CV-1667-TWP, 2014 WL 4259628, at *6 (S.D. Ind. Aug. 29, 2014) (J. Pratt).

A.   **Direct Method**

Ms. Baker can potentially establish a claim of retaliation under the direct method of proof. Under the direct method of proof, a plaintiff must establish:  (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the protected activity and the adverse action.  *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008); *Miller*, 2014 WL 4259628, at *6.  The type of circumstantial evidence that a plaintiff may produce to survive summary judgment under the direct method includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.  *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Martinez v. Ind. Univ. Health, Inc.*, No. 1:12-CV-567-TWP, 2013 WL 5775082, at *6 (S.D. Ind. Oct. 25, 2013) (J. Pratt).

KCI does not dispute that Ms. Baker engaged in protected activity in filing her discrimination complaint or that her termination constituted an adverse employment action. Accordingly, the first two prongs under the direct method are easily satisfied.  However, KCI argues that Ms. Baker cannot establish a causal connection between her discrimination complaint and her termination three months later.

"Mere temporal proximity" is insufficient to raise a question of material fact regarding causation.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *Miller*, 2014 WL 4259628, at *7.

Nevertheless, while suspicious timing alone is insufficient to establish a genuine issue of material fact, suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link.  *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element . . . is typically satisfied"); *Martinez*, 2013 WL 5775082, at *7.

On April 12, 2013, Ms. Baker filed her discrimination complaint with the Indiana Civil Rights Commission.  Less than one week later, on April 17, 2013, KCI received Ms. Baker's discrimination complaint.  Immediately thereafter, KCI began intensely investigating the depth of Ms. Baker's expressed frustrations, with the stated goal of assessing whether to continue or terminate Ms. Baker's employment at KCI.  Indeed, in its brief, KCI describes the process as follows,

> *Following receipt of the discrimination complaint* . . . KCI tasked [Ms. Jones] . . . with the job of investigating Ms. Baker's claims and meeting with Ms. Baker *to determine whether Ms. Baker's concerns could be resolved in a manner that would allow her to be an effective manager for KCI.*

(Filing No. 31 at 12) (emphasis added).  Further, KCI explains that "*[t]he goal was to gauge the level of Ms. Baker's antagonism toward her supervisor and her willingness to continue her career at KCI as a productive representative of KCI's interest in Indiana*."  (Filing No. 31 at 20) (emphasis added).

The Court need not look beyond these two statements in KCI's brief to determine that a causal connection might very well exist between the filing of Ms. Baker's discrimination complaint and her termination a mere three months later.  By its own admission, KCI identifies

the discrimination complaint as the triggering event for its investigation and ultimate decision to terminate Ms. Baker's employment.

Additionally, although KCI considered Ms. Baker's damaged relationship with Mr. Mryncza to be significant, KCI admits that it did not terminate her for this reason, prior to her filing a discrimination complaint. In particular, KCI states, "Ms. Baker was not discharged in April 2013, despite her unprofessional presentation . . . and her attack on her supervisor's character and management style". (Filing No. 31 at 19.) Besides Ms. Baker's stated frustration, made in direct response to KCI's investigation of her discrimination complaint, KCI points to no intervening conflicts between Ms. Baker and Mr. Mryncza after the filing of Ms. Baker's complaint and before her subsequent termination. These facts, coupled with KCI's admission, potentially suggest that the conflict between Mr. Mryncza and Ms. Baker only became a fireable offense after Ms. Baker filed her discrimination complaint.

Similarly, although KCI asserts that it had serious concerns regarding whether Ms. Baker could effectively represent the company's interests in Indiana, given her level of frustration with her supervisor, KCI has presented no evidence to suggest that Ms. Baker's gender discrimination concerns were somehow damaging customer relationships at the time of her termination. Instead, less than two months before Ms. Baker filed her discrimination complaint, KCI rated Ms. Baker "satisfactory" for interpersonal relationships and "above average" for leadership, marketing/ business development, and client and customer satisfaction. In addition, KCI admits that no customer had complained about Ms. Baker's job performance. Indeed, Ms. Baker's supervisors both noted in Ms. Baker's annual review that "[Ms. Baker] continues to make our primary client INDOT happy . . . She has been very successful on this front."

Finally, the Court considers it a factual question whether KCI was working in good faith

to resolve Ms. Baker's discrimination complaint or was unlawfully attempting to push her out because of her complaint.  Although KCI asserts that it terminated Ms. Baker only after she refused to accept a mentor from the corporate office as an accommodation, there is no evidence that KCI attempted to mediate the broken relationship between Ms. Baker and Mr. Mryncza.  Indeed, many of Ms. Baker's statements, which KCI now paints as ultimatums, are softened considerably when considered in the fuller context of Ms. Baker's discrimination complaint and KCI's subsequent investigation.  In particular, the Court notes that Ms. Baker prefaces her most exasperated statements, including her initial rejection of a mentor, with the phrase "in the absence of anything changing" between her and Mr. Mryncza.  In this regard, KCI appears to have offered no discussion or accommodation.  As a result, a reasonable jury could conclude that KCI offered Ms. Baker a "take it or leave it" option of accepting a "mentor" from the corporate office, with no promises of an improved or even mediated relationship with her potentially discriminatory supervisor, or a severance package, all because Ms. Baker filed a discrimination complaint.

For any of these reasons, a reasonable jury could determine that a sufficient causal connection exists between Ms. Baker's discrimination complaint, a protected activity, and KCI's decision to terminate her employment.  Accordingly, Ms. Baker can establish her retaliation claim under the direct method.

## B.     <u>Indirect Method</u>

In addition, Ms. Baker can potentially establish her retaliation claim under the indirect method of proof.  Under the indirect method of proof, a plaintiff must first demonstrate that:  (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; (3) she was performing her job satisfactorily; and (4) she was treated less favorably than a similarly-situated employee who did not complain of discrimination.  *Argyropoulos*, 539 F.3d at

733; *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Under the indirect method, therefore, the first two elements are the same as the direct method of proof. *Stephens*, 569 F.3d at 786. However, instead of proving a direct causal link, a plaintiff must show that she was performing her job satisfactorily and that she was treated less favorably than a similarly situated employee who did not complain of discrimination. *Id.* at 786-87. Once a plaintiff establishes the *prima facie* case under the indirect method, the defendant must articulate a nondiscriminatory explanation for its action. *Id.* at 787. Thereafter, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation is pretextual. *Id.*

### 1.    **Satisfactory Job Performance**

KCI asserts that Ms. Baker was not performing her job satisfactorily at the time it decided to terminate her employment. In particular, KCI argues that Ms. Baker was not getting along with her supervisor and therefore it was concerned whether she could effectively represent the company's interests in Indiana. However, as previously discussed, KCI admits that it did not consider the antagonism between Ms. Baker and Mr. Mryncza to be an offense justifying termination prior to Ms. Baker filing her discrimination complaint. Further, there is no evidence that Ms. Baker's frustration, regarding what she perceived as gender discrimination in both pay and promotion, was actually harming customer relationships at the time of her termination. Instead, just three months prior to her termination, Ms. Baker's supervisors saw Ms. Baker's relationships with her customers as one of her greatest contributions to the company. Accordingly, a factual issue exists as to whether Ms. Baker was performing her job satisfactorily at the time of termination.

### 2.    **Pretext**

Finally, KCI argues that Ms. Baker cannot demonstrate that the stated reasons for its

termination decision were pretextual.  Once the defendant employer asserts a non-invidious explanation for its employment decisions, the plaintiff must then present sufficient evidence to show that the employer's explanation is merely pretextual.  *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).  Pretext means "a dishonest explanation, a lie rather than an oddity or an error."  *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000); *Miller*, 2014 WL 4259628, at *5.  Accordingly, the question is not whether the employer's explanation for its employment decision was "accurate, wise, or well-considered", but whether the employer's explanation was "honest".  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).  While the court is not in the position to "sit as a superpersonnel department that will second guess an employer's business decision . . . [the Court] need not abandon good reason and common sense in assessing an employer's actions."  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001); *Miller*, 2014 WL 4259628, at *6.

A plaintiff can demonstrate that the employer's explanations are pretextual either directly, by showing that "a discriminatory reason more likely motivated" the employer's actions, or indirectly, by showing that the employer's explanations are "unworthy of credence."  *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009).  To show that the employer's non-discriminatory explanations are not credible, the plaintiff must point to evidence that the employer's stated reasons are not the real reasons for the employer's action, have no grounding in fact, or are insufficient to warrant the employer's decision.  *Id.*; *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (noting that a plaintiff must identify such "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted reasons that a reasonable person could find them not credible).

The same questions of fact that underlie the issues of causation and satisfactory job

16

performance also underlie the issue of pretext.  Specifically, Ms. Baker has presented sufficient evidence to rebut each of KCI's stated reasons for her termination, including her satisfactory job reviews, the lack of disciplinary history or customer complaints, and KCI's admission that it did not consider Ms. Baker's damaged relationship with Mr. Mryncza to be an offense justifying termination prior to the filing of her discrimination complaint.  Accordingly, a factual issue also exists regarding the issue of pretext, allowing Ms. Baker to potentially establish her retaliation claim under the indirect method.

Because Ms. Baker has presented sufficient facts, under both methods of proof, for a reasonable jury to conclude that her termination from KCI was in retaliation for her filing a gender discrimination complaint, summary judgment with regard to Ms. Baker's retaliation claim is not warranted.

## IV.  CONCLUSION

For the aforementioned reasons, the Court **DISMISSES without prejudice** Ms. Baker's gender discrimination claim and **DENIES** KCI's Motion for Summary Judgment with regard to Ms. Baker's retaliation claim.  (Filing No. 30.)

**SO ORDERED.**

Date: 1/27/2016

DISTRIBUTION:

John H. Haskin
JOHN H. HASKIN & ASSOCIATES
jhaskin@jhaskinlaw.com

Paul Anthony Logan
JOHN H. HASKIN & ASSOCIATES
plogan@jhaskinlaw.com

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Jay R. Fries
FORD & HARRISON LLP
jfries@fordharrison.com

Paul M. Lusky
FORD & HARRISON LLP
plusky@fordharrison.com

Heather L. Wilson
FROST BROWN TODD LLC
hwilson@fbtlaw.com